Chief Justice Marshall
delivered the opinion of the Court.
On the 19th of October, 1853, Jonathan Myers executed to O. C. Williamson a bill of sale, transferring to him, for the consideration- of $15,000, acknowledged to be received for the steamer Yorktown, No. 2, and the barge Yorktown, No. 2. The bill of sale was regularly recorded in the Custom House at Cincinnati. But the consideration, instead of having been paid, was secured or evidenced by the note of Williamson of even date with the deed, and by which he promised, two years after date, to pay to the order of J. Myers the sum of $15,000, with the following additional words in the note: “But it is ‘ understood that the amounts due by. the steamer ‘ Yorktown, No. 2 and barge is to be deducted from ‘the amount above named — $15,000; this, note be- ‘ ing for the purchase of said boat and barge, and ■* when said boat’s debts are paid then the balance of *530 ‘ the purchase money, secured above, to be paid ‘byO. C. Williamson to Jonathan Myers or his or- ‘ der.” This note was deposited with J. G. Isham, not to be delivered to Myers until the payments made by Williamson, of the previous debts of the boat, were credited on it by Isham, which debts were then supposed to amount to $ 10,000 or more. In November, 1853, the boat entered upon the business of the season, which was prosecuted with great profit, O. C. Williamson acting generally as clerk, and his brothei, Snmuel Williamson, who was received on board after the boat reached the Mississippi on the first downward trip, acting from that time as captain.
On the 3d day of June, 1854, the boat having returned from her last trip to New Orleans fort-hat season, and being in the county of Kenton, opposite to Cincinnati, she was attached by Smead, Collard & Hughes, who set up, in their petition for that purpose, four judgments against Myers, &c., rendered in Hamilton county, Ohio, and bearing ten per cent-um interest, and alledging that the transfer by Myers to Williamson was but colorable, and was made with the intent to defraud the creditors of the former, and especially themselves. Myers answered, admitting that the sale was not a real one, and alledging, in substance, that being embarrassed with debts, and unable to raise funds necessary for finishing the repairs of the boat, and for putting her in condition for entering upon the business of the season of 1853-4, from which he anticipated great profits, and being desirous to realize those profits for the purpose of paying his debts, and fearful that the boat, then in Licking river in Kentucky, would be attached if taken over to Cincinnati, he made the transfer to O. C. Williamson, then a clerk in the store of Isham & ■ Fisher, (the principal creditors of the boat,) and who had formerly been a clerk on his boat, under an arrangement that his brother, Samuel Williamson, should be captain or master, and O. C-. Williamson *531 clerk, at a salary better than he was then receiving, and that the net profits were to be appropriated to the payment of debts of the boat, and other debts of Myers, and that at the end of the season the boat was to be restored to him, Myers. O. C. Williamson answered, denying fraud, insisting'on the fairness and validity of the sale, and claiming the boat as his. In each of these answers particulars are stated which it is not necessary now to detail. Many depositions were taken by the parties respectively, and among them the plaintiffs took those of Myers and his wife, and also of Walker and Haide man , each of whom was bound for one of the debts of Myers set up in the petition.
Soon after the commencement of the suit, to-wit, in August, 1854, the boat was publicly sold under an order of court, and brought $ 14,500, on a credit of six months. And on that hearing, the four depositions above mentioned having been rejected, on the ground of incompetency of the witnesses, and the court being of the opinion that although, without their testimony, the intention of Myers in making the transfer was sufficiently established, there was no satisfactory evidence of Williamson’s participation in it, the petition was dismissed with costs; and from that judgment the plaintiffs have appealed.
The first question arising in the case, as presented in this court, is whether the circuit court erred in rejecting the depositions above referred to, or either of them. The interest of Walker and Haldeman in subjecting the boat or its proceeds to the satisfaction of debts, for which they are themselves bound, for a principal probably insolvent, is obvious; and their competency is scarcely insisted on. But a serious question is made upon the rejection of the deposition of Myers, who, it is contended, has an interest on both sides, equally balanced, inasmuch as if the boat is subjected he looses his claim upon the note, which he will have if the boat is determined to' be the property of Williamson, under his purchase; and *532 if the deterioration of the boat be considered it is1 contended that the balance of interest is against the plaintiffs, who offer the witness. But it appears that credits have already been indorsed on the note by Isham, with whom it was deposited, for about $13,000, for payments made by Williamson, on debts existing against the boat before the transfer ; and although it be conceded that this indorsement does not satisfactorily prove the amount of such payments actually made, still, if the precise amount may be uncertain, it is certain that a large portion of the debt due to Isham & Fisher, of several thousand dollars, has been paid by Williamson, And if it were conceded that in case nothing had been paid upon the contract of purchase, the loss of the price to be paid on that contract would be equivalent to the gain by subjecting the boat to the demands of the plaintiffs, still as there have been large payments on the note, greatly exceeding the deterioration of the boat, and by which Myers has been, to some extent, finally relieved from his debts, he will, if the boat be now subjected to other debts due by him, be the gainer by the entire difference between the price which Williamson was to have paid and the proceeds of the boat as sold under the attachment, with the addition of the sums already paid by Williamson in discharge of debts of the boat due before bis purchase. To the extent of this difference, certainly amounting to a large sum, and perhaps equal to or exceeding four-fifths of the price to have been paid by Williamson, Myers would, by subjecting the boat in this case, realize- a double payment or a double price on it, except so far as the costs of the present proceeding may affect this result.
If the subjection of the boat, in this case, would authorize a recovery against Myers for the breach of his warranty, or his covenant against incumbrances,, this liability, consequent upon a termination of the suit in favor of the party calling him, might be deemed equivalent to the advantage gained by that event. And, as such a liability would be avoided by a differ *533 ent termination of this suit, his interest might be regarded as balanced, and he would be a competent witness against his vendee, even to impeach the sale on the ground of fraud. The same consequence would follow if the subjection of the boat would render him liable to re-pay to Williamson the full amount that he had paid to, and for Myers under the contract of purchase. But, although, in such case Williamson would lose the boat, or rather would lose the benefit of his purchase, it would not be on the ground of any defect in the title of Myers but on the ground of a fraud, in which Williamson participated, so as to render his purchase void as against the creditors of Myers; and as this result would not disprove or defeat but affirm the title of Myers, and would only defeat the title of Williamson, on account of his own wrong, it could not establish or amount to a breach either of the warranty of title or of the covenant against incumbrances; nor, as we suppose, would the law imply a promise or impose a liability to repay to Williamson the sums which he had paid to or for Myers, in pursuance of a contract made with intent to injure and defraud third persons, and which the law itself makes void as to them. It is true the statute declares such a contract void only as to the creditors and purchasers intended to be defrauded; but even this declaration is equivalent to prohibition, and would have made the contract illegal if it haa not been so before the enactmant of the statute. It is a contract in violation of good morals, inconsistent with honest purposes, and therefore against public policy, and not countenanced by the law nor by the tribunals which administer the law. To such a transaction the maxim applies, ex turpi causa non oritur actio. From such a foundation no cause of action can arise; and this is true not only as to any action for the enforcement, or for a breach of the vicious contract itself, but also as to any action by which either party may attempt to regain from the other what, by reason of the invalidity of the trans *534 action as to third persons, he may have lost for the benefit of the other party, and he could not sustain an action either on the contract or for its breach, or on any implied liability to refund what he had paid on it. The law regarding both parties as equally implicated in an illegal transaction, will not interpose in behalf of one of them, either to enforce the illegal contract or to relieve him from the consequences of either a partial or a full performance of it. And this is the only effect which, without defeating the object of the statute, and the certain policy of the law, can be given to the implied declaration that the contract, though void as to creditors, &c., is valid as between the parties to it. The law leaves the parties where they place themselves. If the vicious contract is wholly or partially unexecuted, it will not coerce its execution, and neither party gains by it farther than it is executed by themselves. If it is to any extent executed by the parties themselves, the law will not replace them in statu quo, though one of the parties be a loser by the avoidance of the contract. This inability of each party to recover what he may have lost by the illegal transaction, and the liability which even the fraudulent vendee may incur to third persons by his participation in it, are the penalties by which the law intends to prevent fraud, and to enforce the observance of honesty and good faith.
It is said, in argument, that according to the principle settled in the case of the Planters' Bank of Tennessee vs. Baker, decided at the last term, Williamson, in the event of the loss of the boat, in this suit might, to the extent of his payments, be substituted to the rights of the creditors of Myers, and to their liens on the boat; and that Myers would therefore gain nothing by the subjection of the boat. But the principle of the case referred to is not understood to admit of the application contended for. If the plaintiffs here were attempting to make Williamson liable for the profits of the boat made while he controlled her *535 under his purchase, it would be just that he should have credit for the debts of Myers which he had paid out of those profits, and especially for such as had liens upon the boat. And as he would be entitled to these credits upon general principles of equity, even if the payments had not been made under the fraudulent contract, the fact that they were made in pursuance of it ought not to prevent him from receiving them. The most that the attaching creditors could claim, in such a case, would be that the profits should be regarded as belonging to Myers, and subject to his debts ; and so regarded the fund would be subject to diminution by the amount of all disbursements fairly made in payment of his debts, and the creditors claiming afterwards, by attachment, would be entitled only to the ba’ance, because nothing more could be regarded as his. But this allowance to Williamson would not imply any further liability to him on the part of Mjrers, and it would not diminish his interest in having the boat subjected to his debts not yet paid, because it would not admit a right in Williamson to participate in the proceeds of the sale under the attachment, nor in fact to any interest in the boat itself, although, if he was an actual creditor of Myers, beyond and independent of the fraudulent contract, the chancellor might not wrest from him the possession of the boat without providing for his just claims.' And this measure of favor, which is not involved in the present case, because Williamson’s payments were made from the profits of the boat, is, as we apprehend, the utmost which could be justified by the principles of the case referred to.
1. One having an interest both for plaintiff and defendant, but whose interest prep onderates on one side, is not a competent witness for that party on whose side his interest is greatest; nor is his wife. The rule is general, almost without exception, that a vendor is a competent witness for his vendee, but incompetent for a cred itor of such vendor, who levies upon property, to prove fraud in the transfer.
*535 Upon the whole, therefore, we are of opinion that Myers had a preponderating if not an exclusive interest in the event of this suit, and in favor of the plaintiffs, and that he, and consequently his wife, were incompetent witnesses on that side; although if offered by Williamson, they would have been competent to sustain the sale to him, because their interest *536 as the case stands, would have been on the other side. This distinction and the conclusion at which we have arrived upon the question, are'sustained by the cases of Raglan vs. Wickware, 4 J. J. Marsh., 530; Paul vs. Rogers, Admr's, 5 Mon. 164, and other cases in this court, and by an elaborate citation of authorities in note 111, page 120, of the 2d volume of Phillips on Evidence, by Cowen and Hill, which conclude with stating as “a rule almost unincumbered by exception, that the vender is a competent witness for his vendee, but not for his levying creditor, who offers him on the assumed ground of fraud.” There was therefore no error in rejecting the depositions of the four witnesses above designated, and we put them out of view in our consideration of the case. But independently of those depositions, and giving due weight to the testimony of Isham, who had a nearer connection with the actual transaction between the parties, and might have known more of their motives than any other competent witness, we are of opinion that however fair and honest the parties may at the time have supposed their motives and the transaction itself to be, the established facts and circumstances of the case and of the parties, repel the conclusion that the sale was in fact a real one, and establish as the only admissible deduction, the fact that the form of a sale was resorted to as a means of at once avoiding the attachments which were feared, and satisfying Isham that the boat would be so managed as to furnish a prospect of the debt to his firm being paid out of the profits, and at the same time of providing for the payment of other debts of the boat out of the profits; and that the transfer was made with the understanding between the parties that the boat was still the property of Myers, and to be finally restored to him, or disposed of for his use.
2. Where there lias been a fraudulent Bale made with the intent of securing to the vendor a future interest in the property, and the sale is for less than the value of the pro perty, the chancellor will set aside such sale, and subject the property to the payment of debts due tojudg ment creditors.
*536 What particular inducements may have been held out to Williamson, or why the transfer was made to him, the evidence does not fully disclose. But while the circumstances disclosed enable us to account for *537 the selection of him to take the title and management of the boat under a sham sale, and to control her earnings for the benefit of others, with the right and power of securing to himself a fair and liberal compensation, there is nothing which explains why if the sale was intended to be a real one it was made to him; and there is no single circumstance outside of the formal transfer to him, which accords with the supposition that the sale was intended to be an absolute and irrevocable transfer of the boat. He was clerk in the store of Isham and Fisher, in Cincinnati, engaged at a salary of $1,000 ayear, and possessed of no property but his residence in Covington, worth at most $3000. He had been a clerk on steamboats, and was at some period acting in that capacity for Myers. He had no means to purchase a valuable boat. He could no more have thought seriously of purchasing such a boat as a real transaction, upon his own means and responsibility, than the owner (unless he was ready to give it away), would have thought of selling it to him without security. And yet the boat was transferred to him without security, at a recited consideration, less by one-fourth than the lowest estimate which Myers had ever placed upon her; less by $3,000 than he could have obtained for her in prompt payments, in the summer of 1853, before she had received the repairs which were nearly completed at the date of this transfer; and she was transferred upon terms of payment, which as to the time given, as well as the absence of security, were entirely out of the usual course of similar transactions; being such a sale as no witness had ever heard of; and on looking to the mode in which the payment might be made, we see that it was optional with Williamson whether he would discharge the debts of the boat, and that as he had no other means but from the profits, ether of doing this, or of otherwise paying the price, or so much as might not be paid in this wray, Myers in transferring the boat and her anticipated profits to him, not only gave up him *538 self, and placed in the hands of Williamson the very means by which he was to make payment, and the the only means by which he would be enabled to do so, but left himself without recourse, in case the boat should be lost without making profits, or should be sold by Williamson for money.
The boat must have been worth considerably more on the 19th of October, 1853, when nearly fitted for commencing the business of the season, than she was in August, 1854, when after being in service for six or seven months, she brought on a credit of six months, nearly as much, well secured, as Williamson was to give out of her profits in the course of two years. The lowest estimate of her vendible value, made before the sale in Octobor, is $15,-.000, by a witness who says Myers about that time offered to sell her to him for $20,000; an offer considerably below his usual estimate of her value, and which if made, is to be attributed to the urgency of Isham in pressing for payment or security for the demand of his firm, then amounting to near $5,000, against the boat.
It is proved thatMyers had high expectations with respect to the profits of the approaching season; that he had apprehended attachments upon the boat, by which he might be prevented from reaping those profits; that he was unwilling to sell the boat, but wanted to place her in the hands of a friend who would keep her for him, so that he might be thereby enabled to pay his debts. Isham who advised a sale, and insisted on the boat being placed in other hands for management, as the only means that would secure or satisfy his firm, knew that Myers was unwilling to sell, but that he desired to make a sham sale. His clerk, without means, is the person to whom the transfer is made, upon the terms which have been stated, and after his hesitation, as Isham says, had been removed bylsham’s promise of forbearance and assistance. But Isham took good care to have not only the boat, but also the freight of the first trip in *539 sured for his benefit; while Myers with a greater interest at stake, required no security; took no indemnity; and so far as appears, left the entire arrangement in the hands of Isham and Williamson. And although Isham says Myers proposed to Williamson to buy, it does not appear that he named the price, or the terms; and he certainly exacted no stipulation for his own safety, except for the payment in two years, of a sum which reduced to its value at a discount accordant with the rate of interest on the judgmet against him, was equal only to about $12,000. The arrangement was made to avoid all attachments, and to secure Isham. It was evidently stimulated by his charges of bad management, and his urgency to put the boat in other hands. It was obviously an arrangement for securing through Williamson’s management of the finances of the boat, the debts due to the firm of Isham and Fisher; and from which, Myers, if he was not to retain his right to the boat, derived no advantage, unless in saving the boat from attachments against her in his own hands, and in enabling Williamson to appropriate the profits to paying the debts to Isham and Fisher, and such other debts of the boat as he might choose to pay, and in this way to discharge the price to be given for her. And as Williamson in taking charge of the boat was to protect the interest of Isham, so Isham in taking charge of the note for the price, was to protect the interest of Williamson. And he has done so by crediting the note with more than $13,500, under a date preceding by a few days the commencement of this suit; but which from his own statement, was probably not in fact done until after the suit was brought, and upon such evidences of payment, though satisfactory to himself, he did not retain, and does not produce in giving his deposition. That the credits were to be made up between him and Williamson, is of a piece with other features of the transaction, which go to show that this was a case of confidence, and not a real bargain in which adversary interests are asserted, and to be protected *540 or guarded against. And it is to be observed that even Williamson, coy as he was about assuming the responsibility until encouraged by Isham, never visited the boat for the purpose of inspection, nor even enquired into her precise condition or suitableness for being put into the business of the season. Is it to be presumed that a poor man about to incur a real responsibility to the amount of five times the value of his whole estate, would make no enquiry into the condition and value of that which was to be the consideration of this responsibility? If it is to be presumed that he knew the condition and value of the boat, may it not with equal reason be presumed that he knew the condition and purposes of the owner, who was proposing a transfer; and that he knew the objects of his own employer, who took so prominent apart in cuasing it and carrying it into effect? If, as may be assumed, he knew with reasonable certainty the value of the boat, he knew that the price which he agreed to pay, and in the mode fixed on, was greatly below the real value; and in fact scarcely more than nominal in comparrison with it. Did he suppose that such a bargain was proposed or agreed to by Myers, merely out of kindness to him? Did he not know that the proposed transfer, was intended to evade the remedy of the creditors of Myers, to satisfy and secure Isham and Fisher, his own employers, and to aid Myers by applying the profits of the boat to the payment of his debts? That it was so intended by Myers, and that Isham knew it, is absolutely certain. Isham does not even say that the transfer was intended to be real, or that he himself considered it to be so. And if it could be doubted whether Myers disclosed his purpose to the person chosen to effectuate it, or whether Isham, who also had an object to be effected by the same instrument, did not put him in possession of what he knew on the subject, still, the conduct of these parties, and the nature and circumstances of the transaction itself, were such as must have apprized him of its *541 real character and objects. Res ipse loquitur. And to suppose that he really did not know that the sale to him, whether originally conceived of and proposed by Myers or not, was to be but a sham, intended to effectuate the objects ■ above mentioned, or at any rate the two first, is to suppose that he wilfully closed his eyes and mind to circumstances fully within view, and to their palpable and certain indication. We cannot suppose this. But assume that he did know that the sale was intended to be a sham, and an obstruction and hindrance to creditors; and that as he became a party to it without necessity, the presumption is that he concurred in it. But whether he intended it to be a sham sale, or whether knowing it was so intended by Myers, his own intention from the first was to take advantage of its form for his own benefit, and to the injury of Myers, is immaterial. Having without necessity or excuse, aided Myers in a disposition of his property, fraudulent as to his creditors, they have the right if he has not, to go behind the form and expose, and take advantage of the real character of the transaction: which, if it had really been intended by both parties to be an absolute sale, was such a one as Myers in justice, to his creditors had no right to make.
The evidence discloses many particulars, bearing for or against the conclusion which we have stated, but preponderating decidedly, as we think, in favor of it. We need not encumber this opinion with a detail of them, but merely add, that if this sale is to be sustained, it would evidently have been much better for Myers to have permitted his boat to be attached and sold when she was newly repaired, and would, as the subsequent sale and other facts prove, have brought a much better price, payable in a short time and well secured; and it is not to be forgotten in considering the intent of the transfer, that while the absolute bill of sale acknowledging payment of a price which though low, might not, if actually paid, have been evidence of fraud-, no part of the price *542 was in fact paid, and the real terms of the transfer, so grossly misstated, were not only not made public, but in fact kept private and concealed.
Wherefore, the judgment dismissing the petition is reversed, and the cause remanded for a judgment giving to the plaintiffs the proceeds of the sale of the boat.