### Breyfogle, et al. v. Bowman.

### Bowman v. Breyfogle, et al.

### Winstandley v. Breyfogle, et al.

(Decided January 22, 1914.)

Appeals from Jefferson Circuit Court
(Chancery Branch, First Division).

1. Partnership—Liquidating Partner—Duty and Liability of in
Management of Estate.—Where the affairs of a partnership are

turned over to one of the firm to liquidate, he occupies the position of a trustee and is under a duty to manage and control the business and affairs of the firm in a prudent, careful and businesslike manner, and he cannot, for his own advantage or benefit, use or manage or control the business or affairs committed to his hands as liquidating partner. If anything is lost by his management of the estate in a prudent, careful way, or if anything is gained, it is the loss or gain of the firm and not his.

2. Partnership—Liquidating Partner—Duty of, to Protect Estate Committed to his Care.—Where a liquidating partner has in his possession funds to which the firm is entitled, he cannot purchase with the money of another or with his own money property in which the firm has an interest and have it conveyed to himself, to the detriment of the firm, if the assets of the firm in his hands are sufficient to enable him to purchase it for the firm and it will be to its interest to have it so purchased.

3. Fraud—Fictitious Transfers of Title to Property Will Not Invest Nominal Title Holders . with Ownership.— Where in pursuance of a scheme to defeat creditors, the real owner puts the title to property in the name of persons who are not the real or beneficial owners of it, and who have not paid any consideration for the transfer, the claims of these fictitious owners will not prevent the creditors of the real owner from subjecting the property to the payment of their debts.

4. Limitation—Partners—When Begins to Run Against Liquidating Partner.—The statute of limitation does not begin to run in favor of a liquidating partner, as against creditors or members of the firm entitled to an interest in the assets of the firm, until there has been a settlement of the accounts of the liquidating partner, or. an offer to settle, or an open repudiation of the relation of liquidating partner.

5. Limitation—Liquidating Partner—Fictitious Owners.—Where a liquidating partner, who is to be treated as a trustee, places the title to property in the hands of fictitious owners for the purpose of deceiving creditors and persons interested in the assets, the statute of limitation will not begin to run in their favor until it would have begun to run in favor of the fraudulent transferror of the property.

6. Fraud—Parties in Pari Delicto—Court Will Leave Where It Found Them—Exception to Rule.—The general rule is that the law will leave persons in pari delicto in the same condition that it found them, not affording to either relief against or protection from the other, but where parties occupy toward each other close personal and business relations, one of them will not be allowed to take advantage of his position and influence and the confidence reposed in him by the other to defraud the other out of what is justly due him.

7. Fraud—Parties Passively in Pari Delicto—When Court Will Afford. Relief to One against the Other.—Where one of two parties passively acquiesces in the fraud of the other, the courts will give him relief when it appears that he was controlled or

influenced by the other, who devised, actively arranged and took charge of the fraudulent scheme.

8.  Sales—Under Process of Court—Rights of Creditor when Property Sold Comes Again into the Possession of Debtor.—When property is sold under legal process and only satisfies in part the claim of the creditor, if this identical property again comes into the possession of the debtor, whether it be through his own purchase or that of another person for him, the creditor may again subject it, if it is not exempt, to the satisfaction of the unpaid part of his debt.

9.  Sales—Sale Attacked as Fraudulent—Sufficiency of Consideration.—Where the owner of stock in a corporation placed in the treasury of the corporation a part of it under an agreement that the officers should have the dividends, a creditor of the transferor cannot subject this stock on the ground that the transfer of it was without consideration, when it appears that the transfer was necessary to the continued prosperity of the corporation, and by reason of the transfer the remaining shares were enhanced in value to an extent greater than the value of the shares transferred.

ARTHUR B. BENSINGER for appellant, Winstandley.

WILLIAM W. CRAWFORD for Bowman.

HAZELRIGG & HAZELRIGG and GRUBBS & GRUBBS for Breyfogle.

J. C. DODD, C. H. SHEILD for Peerless Manufacturing Company.

OPINION OF THE COURT BY JUDGE CARROLL—Affirming in part and reversing in part.

Three appeals are prosecuted on this record. One appeal is by W. L. Breyfogle, executor and trustee under the will of Zerelda C. Breyfogle, William L. Breyfogle individually, and John W. Breyfogle against David F. Bowman. Another appeal is that of W. C. Winstandley against W. L. Breyfogle individually and as executor and trustee, John W. Breyfogle, the Peerless Manufacturing Company, and David F. Bowman. The other appeal is by David F. Bowman against William L. Breyfogle individually and as executor and trustee, John W. Breyfogle, and the Peerless Manufacturing Company.

These several appeals grow out of closely connected facts, and all of them relate to the ownership of certain shares of stock in the Peerless Manufacturing Company. This company was organized in 1885 as a Kentucky corporation, with a capital stock of two hundred thousand dollars, divided into shares of the par value of one hun-

dred dollars each. In 1899 a new corporation of the same name and with the same capital stock and powers was organized under the laws of the State of Delaware. To this Delaware corporation the Kentucky corporation transferred all of its assets and property, but no material change was made by the transfer, as the stockholders in the Kentucky corporation became the owners of the same amount of stock in the Delaware corporation that they had owned in the Kentucky corporation.

More than one thousand shares of stock in this corporation were owned in December, 1886, by W. L. Breyfogle, I. S. Winstandley and W. C. Winstandley at which time they formed a partnership under the firm name of Winstandley & Company, for the purpose of engaging in any lines of business that the partnership might agree upon. To the firm of Winstandley & Company each of the partners transferred practically all of the property of every kind that he owned, and it was provided in the articles of partnership that the general and active management of the business and affairs of the firm should be entrusted to W. L. Breyfogle, who was to give his entire time and attention to its business and have an office in the city of Louisville under his immediate control. It was also agreed that W. L. Breyfogle, whose wife was a sister of the Winstandleys should be the owner of three-fifths interest in the property and assets of the firm and each of the Winstandleys the owner of a one-fifth interest, and it might be here observed that W. L. Breyfogle was from the beginning of this partnership, as is shown by the articles of agreement, the dominant and controlling member of the firm.

To this partnership W. L. Breyfogle transferred 700 shares of stock of the Peerless Company then owned by him. I. S. Winstandley transferred to it 187 1-2 shares of this stock, and W. C. Winstandley 187 1-2 shares of the stock.

At the time this partnership was entered into the Winstandleys were largely interested in two banks, one in New Albany, Ind., and the other in Bedford, Ind., and in 1893 both of these banks failed. At the time of the failure the Bedford Bank held as collateral security for the obligations of Winstandley & Company, 187 1-2 shares of Peerless stock, and the New Albany Bank held as collateral security for the obligations of Winstandley & Company, 812 1-2 shares of the Peerless stock.

As a result of the failure of these banks the firm of Winstandley & Company became very much involved although it never made an assignment and in 1893 all of the assets of the firm were turned over by the Winstandleys to W. L. Breyfogle as liquidating partner. He was to take charge and control of all of the assets of the firm that could be saved from the financial wreck and dispose of them to the best advantage for the benefit of the creditors as well as the members of the firm.

Soon after this Breyfogle and the Winstandleys made some arrangement with the assignee of the New Albany Bank by which notes aggregating one hundred and forty thousand dollars were executed by the members of the firm to the assignee, and these notes were secured by the 812 1-2 shares of the Peerless stock that was then and had been previously held by the bank as collateral security for the indebtedness of Windstandley & Company.

After this, a judgment was obtained on these notes by the assignee against Winstandley & Company, and this judgment was subsequently sold with other assets of the firm to David F. Bowman but before it was purchased by Bowman the assignee had sold to one Tuttle the 812 1-2 shares of stock and credited the judgment by amount of sale.

In 1906 Bowman brought suit on this Indiana judgment in the Jefferson Circuit Court against Breyfogle alone, and after an execution had been returned "no property found" Bowman brought suit against Breyfogle individually and as executor and trustee under the will of his wife, Zerelda Breyfogle, John W. Breyfogle, a son of W. L. Breyfogle, and the Peerless Manufacturing Company, for the purpose of subjecting to the payment of the judgment, which now amounts to over two hundred thousand dollars, the interest of W. L. Breyfogle and Winstandley & Company in the capital stock of the Peerless Manufacturing Company.

It may also be here noticed that although the Kentucky judgment was against Breyfogle alone, it was agreed of record that the firm of Winstandley & Company should be liable for the full amount of the Kentucky judgment obtained against Breyfogle as a member of the firm of Winstandley & Company, and so the Kentucky judgment that is the basis of this suit may be treated as a judgment against Winstandley & Company.

In this suit Bowman sought to subject to the payment of his judgment 1,450 shares of the capital stock of the Peerless Company, now worth some two hundred dollars a share, upon the theory that this number of shares of stock was owned by W. L. Breyfogle, or the firm of Winstandley & Company, it not being material which of them owned it, as if either owned it, it could be subjected to the satisfaction of the judgment.

But, although 1,450 shares were sought to be subjected, we are only concerned on this appeal with the title to 1,065 shares, 250 shares of which are known as treasury stock, 295 1-2 shares as the John Breyfogle stock, and 559 1-2 shares as the Tuttle stock.

The chancellor, on hearing the case, subjected to the Bowman judgment 295 1-2 shares of the stock, upon the theory that these shares of stock, although standing in the name of John Breyfogle, were really owned by William L. Breyfogle or Winstandley & Company. He refused to subject the 559 1-2 shares of the 812 1-2 shares known as the Tuttle stock, upon the theory that as all the Tuttle stock had been sold by the assignee of the New Albany Bank and the proceeds of the sale applied as a credit on the judgment before Bowman purchased the judgment, it could not afterwards be subjected to the payment of this judgment, although when sought to be subjected it was owned as the chancellor found by Winstandley & Company. He also refused to subject 250 shares of stock transferred by W. L. Breyfogle in December, 1907, to the Peerless Company, to be held by it as treasury stock; and dismissed the petition of W. C. Winstandley, who came into the Bowman suit by an intervening petition in which he asserted title to a one-fifth interest in the shares of stock owned by Winstandley & Company, after the payment of the firm debts.

W. L. Breyfogle, individually and as trustee, and John W. Breyfogle, appeal from so much of the judgment as subjects the 295 1-2 shares of stock; Bowman appeals from so much of it as fails to subject the 559 1-2 shares of Tuttle stock, and the 250 shares transferred to the Peerless Company and W. C. Windstandley appeals from so much of the judgment as dismissed his intervening petition.

Taking up first the issue made by Bowman as to the validity of the transfer of the 250 shares of stock to the

Peerless Company by John W. Breyfogle, and William L. Breyfogle, as trustee for Zerelda C. Breyfogle, the facts relating to and that induced this transfer are substantially these: The capital stock of the Peerless Company consisted of two thousand shares. W. L. Breyfogle and his wife and son claimed to own and did control 1,450 shares of this stock. The company in 1907 and prior thereto was in a very prosperous condition, due to the efforts of Fred F. Breyfogle as vice-president and treasurer, and the heads of the departments of the company. These parties who had the active management of the company, and whose industry and skill placed it in the prosperous state it occupied, became dissatisfied with the conditions that enabled W. L. Breyfogle and his family to receive the major part of the earnings of the company through their claim of ownership, of the majority of its capital stock, and finally informed W. L. Breyfogle that they would not longer continue to give to the affairs of the company the care and attention they had theretofore exerted unless there was transferred by W. L. Breyfogle and his family to the company 250 shares of the capital stock, to be placed in the treasury of the company under an agreement that the earnings or dividends on these shares should be set apart to and distributed among the heads of the departments. W. L. Breyfogle, acting for himself and his wife and son, evidently realized the necessity of complying with this request as an inducement to the officers and heads of the departments to continue with the company and maintain its prosperity and agreed to this request.

And so in December, 1907, a meeting of the board of directors of the company was held at which W. L. Breyfogle, who was president of the company, proposed to the board that on January 1, 1908, he would place in the treasury of the company 250 shares of its capital stock, and that beginning with that date all of the earnings and dividends on these shares should be divided, subject to the direction of the board of directors, among the employes of the company. This proposition was accepted by the board of directors, and the vice-president of the board, Fred F. Breyfogle, was instructed to carry out its provisions.

Pursuant to this arrangement, on December 31, 1907, William L. Breyfogle, purporting to act as trustee for Zerelda C. Breyfogle and John W. Breyfogle, trans-

ferred to and placed in the treasury of the company 250 shares of its capital stock. Although it appears that 150 shares of this stock were standing in the name of H. M. Bellows and 100 shares were standing in the name of W. P. Tuttle, it was not really owned or controlled by them.

There was no consideration for the transfer of this stock except the agreement on the part of the officers and heads of the departments in active charge of the business of the Peerless Company to remain in its service, and the evidence shows that the continuance of these officers and heads of departments with the company was indispensable to its prosperity. Indeed the evidence shows that it was due almost entirely to the skill and energy of these men that the Peerless Company had reached the prosperous condition it enjoyed when the transfer of this stock was made.

It is insisted, however, in behalf of Bowman, who is attempting to subject this 250 shares of stock, as well as other shares charged to be owned by W. L. Breyfogle or Winstandley & Company, to the satisfaction of the Bowman judgment, that the transfer of these shares was without a sufficient consideration to support it, and this being so, the stock may be subjected by Bowman to the payment of his judgment.

We do not think so. It was of course to the manifest interest of every person owning or asserting claim to shares of stock in this company that the business affairs of the company should be continued in a prosperous condition, for otherwise the stock would be of no value. And this being so, we think that a good and valuable consideration was paid for this stock because, as shown by the evidence, if the men who were to be the beneficiaries of the transfer of this stock had severed their connection with the company, its business would have been practically destroyed and the stock of little or no value. Their continuance with the company maintained it in a prosperous condition and prevented any depreciation in the value of the stock. In other words, the arrangement enhanced the value of the remaining shares in an amount equal to the value of the 250 shares transferred to the company. So that if it should be assumed that Bowman or some other creditor was entitled to subject this 250 shares of stock, if it had not been transferred, they have not lost anything by the transfer that puts it out of their

reach. On the contrary they have been benefited by the transaction.

If, however, the company should for any cause cease to carry on the business it is now engaged in, the body of this stock should be restored to the persons entitled to it at that time, as the company is only the beneficial owner of the stock so long as it remains in the business it was engaged in when the stock was transferred to it.

The remaining questions relate to the correctness of the judgment subjecting the 295 1-2 shares; to the right of Bowman to subject the 559 1-2 shares of what is known as the Tuttle stock, and the right of W. C. Winstandley to maintain his intervening suit to recover one-fifth of the shares of stock owned by Winstandley & Company, after the creditors of this firm are satisfied.

Passing for the present the questions arising on the intervening petition of W. C. Winstandley, it seems to be conceded that when the firm of Winstandley & Company was organized W. L. Breyfogle owned 700 shares of Peerless stock, I. S. Winstandley 187 1-2 shares and W. C. Winstandley 187 1-2 shares, and that all of this stock was transferred by these owners to the firm of Winstandley & Company. It is further well established by the evidence that the Peerless Company, although organized in 1885, was not put on an earning basis until about 1893 or 1894, but since that time it has been an exceedingly prosperous concern, paying each year large salaries to its officers and large dividends to its stockholders.

It is also shown without material contradiction that neither of the Winstandleys have ever received, in the way of dividends or otherwise, from the Peerless Company more than trifling amounts, although W. L. Breyfogle has been paid by this company, on the 1,450 shares of stock which include the 855 shares here involved, in the way of dividends and salary, more than $400,000, not including $50,000 received by him from Fred Breyfogle for 345 shares sold to him.

In defense of this suit is is contended that the stock sought to be subjected to the payment of the Bowman judgment was not owned by either W. L. Breyfogle or Winstandley & Company, but on the contrary, was owned by his son, John W. Breyfogle, who had a part of it in his own right and a part received by inheritance from his mother, Zerelda Breyfogle, who died in 1910. The

further claim is made that all of this stock sought to be subjected had been assigned and transferred to John W. Breyfogle and Zerelda Breyfogle, in good faith, and for a valuable consideration, long before the institution of the Bowman suit, and that after the failure of the firm of Winstandley & Company, neither Breyfogle nor this firm had any interest or ownership in the Peerless stock. It is conceded, however, that W. L. Breyfogle at all times managed and controlled, previous to the transfer of the 345 shares to Fred Breyfogle and the 250 shares to the Peerless Company, the entire 1,450 shares, and subsequent to these transfers, controlled the remainder of the 1,450 shares, although it is said that this control was by virtue of the position he occupied as trustee for his wife and son, who were the real owners.

On the other hand, it is the claim of Bowman, and we might add W. C. Winstandley, that this stock, although standing on the books of the Peerless Company in the name of different persons at different times, was at all times really owned by Winstandley & Company.

It may further be here noticed that W. L. Breyfogle, although he admits that all the assets of Winstandley & Company were turned over to him as liquidating partners when the company failed in 1893, claims that all of its business was finally wound up and settled sometime previous to 1898, while the weight of the evidence shows that this firm was in existence, with an office or place of business in the city of Louisville until 1902, and that as late as 1908 Breyfogle was engaged in winding up the affairs of Winstandley & Company.

So that we may safely say on this point that in 1893, when the firm of Winstandley & Company failed, all of its books and assets were turned over to W. L. Breyfogle as liquidating partner for the purpose of winding up its affairs, and that he continued in charge of its affairs as liquidating partner until as late as 1908.

It may also be here observed that as liquidating partner of the firm of Winstandley & Company W. L. Breyfogle was under a duty to manage and control the business and affairs of the firm in a prudent, careful, business-like manner, and in such a way as would conserve the interest not only of the members of the firm but its creditors. He could not, for his own advantage or benefit, use or manage or control the business or affairs of this firm while it was in his hands as liquidating part-

ner. He occupied toward the estate committed to his keeping the attitude of a trustee, and everything that he did in connection with the business affairs of this firm inured to the gain or loss of the firm, as the case might be. If anything was lost by his management of its affairs in a prudent, careful way, or if anything was gained under his management of the affairs, it was the firm's loss or gain and not his. Jones v. Dulaney, 27 Ky. Law Rep., 702.

Returning now to a consideration of the ownership of the 295 1-2 shares and the 559 1-2 shares of Peerless stock, it is necessary to learn how and from what sources this stock came into the possession of W. L. Breyfogle.

In the judgment of the lower court and in briefs of counsel these 855 shares of stock are separated, and the title to 295 1-2 shares is treated separately from the title to 559 1-2 shares, but, as we have reached the conclusion that all of this stock was and is owned by the firm of Winstandley & Company, and together with the dividends thereon from April 26, 1911, subject to the payment of the Bowman judgment, we will consider it as if it were one block of stock and trace the title to the constituent parts of it so far as may be necessary to explain our views as to its ownership.

One hundred and five shares of this stock are a part of 250 shares originally in the name of Charles Vandusen, who acquired it in 1885. It seems that Vandusen was an officer of the Peerless Company, and, becoming indebted to that company, transferred to Winstandley & Company this 250 shares of stock under some arrangement by which they were to satisfy his indebtedness to the Peerless Company, and in consideration therefor take this stock. Although there is some conflict in the evidence, the decided weight of it shows that in 1891 Winstandley & Company became the owners of this stock, although the physical possession as well as the control of it was in W. L. Breyfogle, and it appears that in 1892 William L. Breyfogle transferred 100 shares of this stock to John Breyfogle as a gift, and that John Breyfogle, in 1909, transferred it to his mother, Zerelda, the wife of W. L. Breyfogle. But, although this 100 shares of stock was at one time on the books of the Peerless Company in the name of William L. Breyfogle, and then in the name of John Breyfogle, and later in the name of Zer-

elda Breyfogle, it was at all times voted and controlled by W. L. Breyfogle, who received the dividends thereon.

One hundred shares of this stock was originally issued to John Barbee, and came into the possession of Fred Breyfogle in 1894, and by Fred Breyfogle was transferred to John Breyfogle, who subsequently transferred it to Zerelda Breyfogle. There is here also conflict in the evidence as to how this stock was paid for, but we agree with the chancellor that this stock was really purchased with the money of Winstandley & Company, and although standing on the books of the Peerless Company for several years in the name of John W. Breyfogle, the use of his name was merely a scheme of W. L. Breyfogle to deceive the creditors of Winstandley & Company as to the real ownership of this stock.

Ninety and a half shares of this stock are a part of the 187 1-2 shares originally issued to W. C. Winstandley and pledged by him to the Bedford Bank. These 187 1-2 shares were purchased from the Bedford Bank by a man named Young in 1895 for thirty-five hundred dollars, which was borrowed from one Brown. W. L. Breyfogle claims that this stock was purchased with the money of his wife and really belonged to her, but we think the evidence shows that it was bought with the assets of Windstandley & Company and that they should be treated as the owners of it.

It might here be mentioned that the purchase of this stock and its various transfers on the books of the company was also managed by W. L. Breyfogle, who permitted 185 shares of it to stand on the books of the Peerless Company in the name of R. A. Young, a stenographer, for a number of years, this method being resorted to to conceal the real ownership of the stock from the creditors of Winstandley & Company.

The 559 1-2 shares are a part of the 812 1-2 shares that were transferred as before stated by Winstandley & Company as collateral security to the New Albany Bank, and while we are only concerned with 559 1-2 shares of it, it will be convenient to consider the transaction as if there were 812 1-2 shares involved in it. These 812 1-2 shares were sold in 1898 by the assignee of the New Albany Bank to a man named Tuttle for fifteen thousand dollars, and it is the contention of W. L. Breyfogle that this stock was purchased from Tuttle with the money of Zerelda Breyfogle; while Bowman and Win-

standley claim that it was purchased from Tuttle for the firm of Winstandley & Company and with the assets of that firm.

There is a great deal of evidence on the subject as to who furnished the money with which this stock was purchased, but we shall not undertake to enter into a discussion of the weight or effect of the conflicting testimony relating to the purchase of this stock. Its purchase was engineered by W. L. Breyfogle. It was bought by Tuttle at his instance and transferred to him or to other persons at his request by Tuttle. At the time this stock was purchased W. L. Breyfogle as liquidating partner of the firm of Winstandley & Company, had full control of its assets and its affairs, and when this stock was put on the market for sale, Breyfogle, as trustee and liquidating partner was under a duty to save it, if it could be done, because this stock was an exceedingly valuable part of the assets of the firm of Winstandley & Company that had been transferred as collateral to the New Albany Bank to secure the paper of this firm. That he could have secured it for the estate of Winstandley & Company in his hands as a liquidating partner there is no doubt.

In 1894 the Peerless Company paid 20 per cent dividend on its capital stock; in 1895, 15 per cent; in 1896, 10 per cent, and for the years 1897 to 1902, inclusive, a salary of twelve thousand dollars a year was paid to W. L. Breyfogle in lieu of dividends. In short, in all these years W. L. Breyfogle was receiving these large dividends, or a salary equivalent to an 8 per cent dividend, on 1,450 shares of stock in the Peerless Company. At the time these 812 1-2 shares of stock were purchased for fifteen thousand dollars it was easily worth five times that amount; so that as we look at this transaction it is not important whether it was bought with the money of Mrs. Breyfogle or with the money of Winstandley & Company, although we are inclined to believe from the evidence that it was purchased with the money of Winstandley & Company. Because W. L. Breyfogle, occupying the position that he did will not be permitted to say that he purchased it with the money of Mrs. Breyfogle and for her benefit. He had at that time, or should have had in his possession, money received in the way of dividends from stock in the Peerless Company owned by Winstandley & Company that amounted to many thou-

sands of dollars more than was paid for this stock, and we will treat it as the chancellor did, as owned by Winstandley & Company reserving until later a consideration of the right of Bowman to subject it.

Under this view of the case, all of the 295 1-2 shares and all of the 559 1-2 shares here in controversy are to be treated as the property of Winstandley & Company.

We are not unmindful of the fact, more than once stated, that there is much conflict in the evidence as to the real ownership of this stock, and as to whose money it was purchased with, but W. L. Breyfogle's acts and conduct in relation to this stock and its various transfers show him without question in the attitude of resorting to every possible scheme and device to conceal the real ownership of this stock from the creditors of Winstandley & Company. It shows him in the attitude of deceiving and misleading even the Winstandleys as to the value of the stock and keeping it on the books of the Peerless Company in the names of persons who had no interest whatever in the stock. It shows him in the attitude of managing and controlling from 1893 to 1911 these 855 chares of stock on which he received in the way of salaries and dividends many thousands of dollars, and yet during this time it does not appear that the creditors of Winstandley & Company were ever paid a cent on their debts by him out of the large sums of money he received as dividends, or that the Winstandleys, who were each entitled to the same extent that Breyfogle was to one-fifth of the earnings of this stock after paying for its purchase ever received more than a mere pittance. Under these circumstances, if there was doubt in our minds as to who furnished the money that paid for this stock, we would resolve, as did the chancellor, all of these doubts against Breyfogle.

But it is earnestly pressed by counsel that the title of John W. Breyfogle and Zerelda Breyfogle is bona fide and is not to be affected by the misconduct of W. L. Breyfogle. This argument, however, entirely overlooks the undisputed fact that every purchase, every transfer, and every step taken in the management, control and disposition of this stock from the very beginning down to the institution of this suit was under the direction of W. L. Breyfogle, and that the transfers of the stock to John W. Breyfogle and to Zerelda Breyfogle were made by W. L. Breyfogle, or parties acting at his suggestion,

without consideration, and in fraud of the rights of the creditors, and in more than one instance in fraud of the rights of the Winstandleys. It overlooks the facts that all of the stock involved in this controversy—the Vandusen stock, the Parker stock, and the Tuttle stock, was purchased by W. L. Breyfogle at a time when he had in his possession money received by him as dividends on the stock of Winstandley & Company largely more than sufficient to pay the purchase price of all this stock, and thousands of dollars besides derived from this same source. And it overlooks the fact that connected with the purchase of all of this stock was the dominant purpose always in the mind of W. L. Breyfogle to conceal the real owners of the stock and to conceal its real value from the creditors of Winstandley & Company, and, on more than one occasion, from the Winstandleys. It overlooks the fact that John W. Breyfogle and Zerelda Breyfogle were mere instruments in the hands of W. L. Breyfogle that he used for the purpose of carrying out his scheme of defeating the creditors of Winstandley & Company in the payment of their debts, and in defeating his partners in the interest in the stock to which they were entitled, thereby enabling him to appropriate to his own use and benefit this valuable stock and the enormous dividends that were paid on it.

Under these circumstances it is not singular that we decline to recognize any meritorious interest in this stock in either Zerelda or John W. Breyfogle.

The statute of limitation, providing that no action to obtain relief from fraud shall be brought ten years after the time of the perpetration of the fraud, is also relied on to sustain the right of John W. Breyfogle and Zerelda Breyfogle to retain the stock that was transferred to them more than ten years before the institution of this action. But, in our opinion, the statute of limitation has no place in this case. W. L. Breyfogle, as liquidating partner of Winstandley & Company, was the trustee of an express trust. He could only discharge himself from the obligation of this trust by managing the business committed to his hands in a careful, prudent, business way for the benefit of Winstandley & Company and the creditors of the firm, and not until there was a settlement of his accounts as liquidating partner of Winstandley & Company, or an offer to settle his accounts, or an open repudiation of his trusteeship, would the

statute of limitation begin to run in favor of W. L. Breyfogle and against the creditors of Winstandley & Company and the other members of that firm; and the evidence shows that there was no open repudiation of this trust or genuine offer to settle his accounts as trustee, although there were many surreptitious repudiations of it and possibly an occasional insincere proposition to settle the affairs of the firm. Riddle v. Whitehill, 135 U. S., 621, 34 Law Ed., 282. The reception and continued retention by W. L. Breyfogle of all of the dividends received on this Peerless stock, without any offer on his part to give to the other members of the firm their share of it, or to pay a single cent on the indebtedness of the firm, is conclusive evidence of the fact that there had never been a settlement of his accounts as liquidating partner.

It is said, however, that although this may be true as to W. L. Breyfogle, that John W. and Zerelda Breyfogle, to whom this stock was transferred by W. L. Breyfogle, are not to be denied their right to rely on the statute to defeat the efforts to subject this stock, at least in so far as the transfers to them were made more than ten years before the institution of this suit.

But this argument is lacking in the one thing essential to sustain it as a substantial or meritorious defense in their behalf, and the lacking thing is that although this stock was transferred by W. L. Breyfogle to John W. and Zerelda, or to them by other persons acting under his direction, it was at all times, in truth and in fact, treated by him as his stock, and he was at all times so far as they were concerned the real and beneficial owner of it.   As well said by  the chancellor in his opinion, "There would be much force in this contention if the transfers of the shares were in fact what on their face they purported to be, but the court is convinced by the evidence that the stock in question, in whosesoever name it may have appeared or may now appear on the books of the Peerless Manufacturing Company, was and is in reality held by the defendant, W. L. Breyfogle, and not by his wife or son, any muniment to the contrary being manifestly nominal and colorable only.   The evidence is conflicting  on many points,  and regarding several matters the court has found much difficulty in determining exactly what the fact was, but on the question as to who has really gotten the benefits of the Peer-

less stock throughout its various transfers to and from clerks, stenographers, bookkeepers and relatives, the evidence, direct and circumstantial, permits no doubt as it seems to the court. No badge of absolute and sole proprietorship in W. L. Breyfogle is lacking, unless the court is to allow the convincing combination of circumstances shown by the proof to be brushed aside by such incidents as the *ex post facto* use by W. L. Breyfogle of the word trustee, and other equally transparent expedients resorted to by him to bewilder the inquirer or to conceal the true situation.''

Under the circumstances of this case to recognize the statute of limitation as a bar to the subjection of this stock would convert the statute into an instrument of fraud and enable wrongdoers to reap the benefits of fraudulent conditions that they had cunningly devised and systematically pursued in an effort to defeat the collection of debts, as well as to deprive members of the firm of what was justly due them.

The doctrine of laches is also relied on to estop the Winstandleys and Bowman from asserting their claim to subject this stock, but the persistent and successful effort of W. L. Breyfogle to conceal the ownership of this stock as well as the prosperous condition of the Peerless Company, take from this plea any merit it might otherwise have.

Coming now to consider the action of the chancellor, in dismissing the intervening petition of W. C. Winstandley, it appears that he was influenced by his conviction that Winstandley approved of the efforts put forth by W. L. Breyfogle to prevent the creditors of Winstandley & Company from reaching the assets of that firm, and was at least a passive participant in the schemes of W. L. Breyfogle to defraud the creditors of Winstandley & Company. Having this view he refused to allow him to come into the case and assert his right to one-fifth of this Peerless stock, after the creditors of Winstandley & Company had been satisfied. This branch of the case presents an interesting question, but upon a careful consideration of the relationship between W. L. Breyfogle and W. C. Winstandley, and the dominating influence exercised by Breyfogle, we have come to the conclusion that the passive participation of Winstandley in the efforts of Breyfogle to conceal the ownership of this stock and thereby prevent its subjection to

the debts of the creditors, excepts Winstandley from the operation of the general rule that the law will leave persons in pari delicto in the same condition that it found them, not affording to either relief against or protection from the other.

The evidence shows, in fact, W. C. Winstandley candidly admits, that he was acquainted with the purpose of W. L. Breyfogle to so hide the ownership of the Tuttle stock and the stock purchased from Parker as to make it difficult for the creditors of Winstandley & Company, and especially Bowman, to discover its true ownership, and that in an insignificant way he participated in these efforts originating in the fertile mind of W. L. Breyfogle. These men were brothers-in-law, and the evidence clearly shows that Breyfogle was the leading and controlling spirit in every enterprise they engaged in, and the active manager of all the business affairs in which they were jointly interested.

It further shows that Winstandley had implicit confidence in the integrity of Breyfogle and in his business ability, and that in all matters connected with their business he deferred to Breyfogle's wishes. It shows that Winstandley had nothing of moment to do with the purchase of the stock by either Tuttle or Young or its acquisition by Breyfogle; had nothing to do with the manner in which this stock was registered on the books of the Peerless Company in the names of fictitious owners; or with the methods originating with Breyfogle to save it from the creditors. In fact, it only appears that Winstandley had actual knowledge of these fraudulent schemes on the part of Breyfogle and passively acquiesced in them, and it is evident that everything he did, which was little, to assist in the concealment of this stock, was put into his mind by Breyfogle, whose advice he always adopted and whose counsel he always followed.

It should also be kept in mind that when these transactions took place Breyfogle had in his possession as liquidating partner all the assets of Winstandley & Company. He occupied toward these assets and all that concerned them in a business and material way the attitude of a trustee, and the two Winstandleys held the relation of *cestui que* trust. They had surrendered to Breyfogle everything they had, with the understanding that he

would manage it in such a way as to best conserve their interests.

Under these circumstances, we think W. C. Winstandley should not be estopped from seeking to recover from Breyfogle his interest in these 855 shares of stock.

There is, too, ample authority to support the conclusion that when two persons occupy toward each other the personal and business relations that Winstandley and Breyfogle did, that one of them should not be allowed to take advantage of his position and his influence and the confidence reposed in him by the other to defraud the other out of what is justly due him.

In Pomeroy's Equity Jurisprudence, vol. 2. sec. 942, this learned writer, in discussing the proposition that the courts will generally leave persons who have entered into agreements for fraudulent purposes in the position they placed themselves, not affording to either any relief, points out some exceptions to this sound rule that are peculiarly applicable to the facts of this case, saying:

"Lastly, when the contract is illegal, so that both parties are to some extent involved in the illegality—in some degree affected with the unlawful taint—but are not in *pari delicto*—that is, both have not, with the same knowledge, willingness and wrongful intent, engaged in the transaction, or the undertakings of each are not equally blameworthy—a court of equity may, in furtherance of justice and of a sound public policy, aid the one who is comparatively the more innocent, and may grant him full affirmative relief, by canceling an executory contract, by setting aside an executed contract, conveyance, or transfer, by recovering back money paid or property delivered, as the circumstances of the case shall require, and sometimes even by sustaining a suit brought to enforce the contract itself, or if this be impossible, by permitting him to recover the amount justly due, by means of an appropriate action not directly based upon the contract. Such an inequality of condition exists so that relief may be given to the more innocent party, in two distinct classes of cases: 1. It exists where the contract is intrinsically illegal, and is of such a nature that the undertakings or stipulations of each, *if considered by themselves alone,* would show the parties equally in fault, but there are collateral and incidental circumstances attending the transaction, and affecting the relations of the two parties, which render one of them comparatively

free from fault. Such circumstances are imposition, oppression, duress, threats, undue influence, taking advantage of necessities or of weakness, and the like, as a means of inducing the party to enter into the agreement, or of procuring him to execute and perform it after it had been voluntarily entered into. 2. The condition also exists where, in the absence of any incidental and collateral circumstances, the contract is illegal, but is *intrinsically* unequal; is of such a nature that one party is necessarily innocent as compared with the other; the stipulations, undertakings, and position of one are essentially. less illegal and blameworthy than those of the others.''

In Cook v. Colyer, 2 B. Mon., 71, this court, in holding that the unequal position the parties occupied would influence the court to protect one of them, under facts somewhat similar to those in this case, said:

''The salutary principle of equity, now urged in bar of Cook's right to relief, should not be extended beyond the reason and policy which dictated it; and it does not, therefore, necessarily apply to a case in which the defending party had himself first conceived the fraud for his own benefit, and either by his artifice or influence induced the complaining party to concur with him in the attempted conclusion. And such, as we are strongly inclined to apprehend, is the true character of the transaction between these parties. It does not appear that Cook had ever contemplated or desired any fraudulent device for defeating or delaying his creditors, or that he even understood the object or effect of an absolute bill of sale; and it does appear that Colyer, for his own obvious benefit as well perhaps as for that of Cook, conceived and proposed a scheme for securing the slave in his own possession, and urged it successfully on Cook, who seems, with a childlike simplicity, to have confided in his judgment, integrity, and friendship; and we do not even feel bound to infer that Cook, when he finally consented that Colyer and Slaughter might do whatever they deemed best, knew precisely what was intended or would be done, or that, whatever it might be, it would be a fraud, either actual or constructive.'' To the same effect are: Anderson v. Merideth, 82 Ky., 564; Sanford v. Reed, 27 Ky. L. R., 431; and Harper v. Harper, 85 Ky., 160.

And while we have no disposition to modify or depart from the well established principle so often announced by this court and others, as illustrated in the cases of Carson v. Beliles, 121 Ky., 294; Smead v. Williamson, 16 B. Mon., 492; Coleman v. Coleman, 147 Ky., 383, and Jayne v. Jayne, 148 Ky., 613, that where the parties are in *pari delicto* no affirmative relief of any kind will be given to one against the other, we are well satisfied from a careful consideration of the evidence that the facts of this case bring it safely within the scope of the exception noted in the authorities cited.

Having this view of the matter, we think the chancellor should have permitted the intervening petition of W. C. Winstandley to be filed, and that he should have, when the issues presented by his petition came up for judgment, such relief as he would be entitled to if there was no claim that he was estopped from obtaining it by reason of his participation in the frauds of W. L. Breyfogle.

The remaining question concerns the ruling of the chancellor that the Tuttle stock cannot be subjected to the satisfaction of the Bowman judgment. We have heretofore briefly passed on this feature of the case, but its importance demands more extended reference than has been given it. It will be remembered that the Tuttle stock was pledged by Winstandley & Company to the New Albany Bank to secure the notes executed by this firm, when it failed; and it will also be remembered that after the judgment was obtained on these notes, this stock was sold and the proceeds of the sale applied as a credit on the judgment, the judgment being thereafter purchased from the assignee by Bowman. In disposing of this issue the chancellor in his opinion said:

"The point is made by counsel for W. L. Breyfogle that the stock known in the record as the Tuttle stock, consisting of 812 1-2 shares, cannot be subjected to the satisfaction of the plaintiff's judgment, because it has already once been sold for that purpose. It seems to the court that the point is well taken and that this stock must be eliminated. However, it is to be regarded as held by W. L. Breyfogle as liquidating partner of Winstandley & Company."

It will thus be observed that the chancellor was of the opinion that, although this stock could be subjected by the creditors of Winstandley & Company other than Bowman, it could not be subjected to the satisfaction of

his debt, because it had once been sold and the proceeds applied as a credit on the debt that Bowman afterwards purchased.

We do not find ourselves able to agree with the chancellor in this conclusion. A creditor has the right to subject to the payment of his debt any property owned by the debtor that is not exempt from the process of the court, and it does not seem to us material when or how the creditor obtains the property that may be so subjected. If the creditor subjects by legal process to the payment in part of his debt specific property of the debtor, and afterwards at any time the debtor comes into the ownership of this property, we are unable to perceive upon what ground it can be maintained that the creditor may not again subject it in satisfaction of the unpaid part of his debt, assuming of course that it could be subjected by other creditors.

When the creditor subjects to the payment in part of his debt property of the debtor, the remainder continues a valid and subsisting indebtedness until it is barred by limitation or satisfied in some way, and for the purpose of paying this indebtedness, the creditor has the right to subject any property of the debtor that he may find that is not exempt from legal process. If the debtor buys in at the sale property that has been subjected by the creditor to the payment in part of his debt, or if it is bought by some one else and conveyed to the debtor, the creditor may thereafter subject this property to the unpaid part of his indebtedness to the same extent as he could property received in any other way, or from any other source by the debtor.

It seems that the Missouri court in Thomas v. Cohen, 127 Mo., 215, reached a different conclusion; but we are not disposed to follow the ruling of the Missouri court. Indeed it stands alone on this subject so far as our investigation goes. And a contrary conclusion was reached by the Indiana court in Goddard v. Kastner, 57 Ind., 532; by the Oregon court in Settlemire v. Newsome, 10 Oregon, 446; and by the South Dakota Court in Seaman v. Galligan, 8 S. D., 277.

Wherefore, the judgment on the appeal of Breyfogle, et al. v. Bowman is affirmed, and the judgment on the appeals of Bowman and Winstandley v. The Peerless

Manufacturing Company is affirmed. The judgment on the appeal of Winstandley v. Breyfogle is reversed. And the judgment on the appeal of Bowman v. Breyfogle is reversed for further proceedings in conformity with this opinion. The whole court sitting.