# Pursifull v. Interstate Oil & Gas Corporation.

Nov. 27, 1942.

Wilson & Wilson for appellant.

Thomas E. Sandidge and Craft & Stanfill for appellee.

OPINION OF THE COURT BY JUDGE TILFORD—Reversing.

This action was instituted by appellee to procure the cancellation of an assignment transferring all of its oil and gas leases to the appellant. The instrument purported to have been executed and acknowledged on August 6, 1937, by the President and Secretary of the corporation, but, in fact, was prepared by W. M. Pursifull, appellant's brother and the corporation's general manager, who attached to the instrument the signatures and acknowledgments of the corporation's officers cut from one of the blank forms of assignment left with him by them for use in transferring the corporation's leases in the ordinary course of its business. It is not contended that W. M. Pursifull was not authorized by the corporation to prepare and deliver assignments of its leases by the method which he pursued in this instance, and the

manner of its execution is unimportant except for the bearing it may have upon the question, not controlling in our view, whether or not the corporation's stockholders, who were also its officers, had knowledge of, and acquiesced in the transfer, which was not recorded until January 12, 1939.

If the corporation owned the equitable as well as the legal title to the properties, and was not, as charged by appellant, a mere device conceived and brought into being for the fraudulent purpose of holding title to W. M. Pursifull's properties in order to put them beyond the reach of his creditors, it may be conceded that, notwithstanding the broad powers conferred upon him by the Board of Directors to sell and convey the corporation's properties, he was without authority to transfer them to his brother for a consideration moving to him. Assuming the major premise on which appellee rested its case, namely, that the corporation was the bona fide owner of the property, the Chancellor, in deference to elementary principles of corporation law, could not have withheld the relief sought, unless he had found that the corporation had ratified the technically unauthorized act. While we believe that all the purported owners of the corporation's stock did, in fact, acquiesce therein during the intervening period preceding W. M. Pursifull's death on February 16, 1939, we would not have disturbed a finding by the Chancellor, had one been made, to the contrary. It follows that if appellee is not entitled to the relief granted by the Chancellor it is because of the falsity of its major premise and the consequent applicability of the "clean hands" doctrine. Denying the applicability of that doctrine, appellee contends that although a fraudulent grantor and grantee are usually held to be in pari delicto, the grantee's participation in the original transaction will not prevent him from obtaining relief against the grantor for fraudulent misconduct on his part in attempting to effect a reconveyance to his assignee. Thus it becomes necessary to determine whether the corporation was the actual owner of the property or merely the fraudulent grantee of W. M. Pursifull; and in the latter event, whether it was precluded by its participation in the fraud from maintaining an action against appellant to cancel W. M. Pursifull's transfer to him.

That the corporation was formed for the corrupt

purpose charged by appellant, a perusal of this record leaves no doubt. It was so intimated, if not decided, in the cases of Cooper v. Keyes, 246 Ky. 268, 54 S. W. (2d) 933, and National Bank of Kentucky's Receiver v. Inter-State Oil & Gas Co., 246 Ky. 276, 54 S. W. (2d) 936, to which reference is made for details unnecessary to be here set forth. The incorporators were W. M. Pursifull's three brothers-in-law, Dr. J. R. Tinsley, C. V. Cooper, and Dewey Daniels, all of whom were engaged in other occupations. They subscribed for the authorized capital stock of $15,000 and were reimbursed for the $500 which each of them paid from the sale of an oil lease previously negotiated by W. M. Pursifull in the name of Dr. Tinsley. In this connection we quote the following from the testimony of C. V. Cooper, given in the second of the two cases above cited, and by agreement made part of the record in the case at bar:

"Q. Mr. Cooper, is it not a fact that before the corporation was organized, a contract had been made for Dr. Tinsley to sign, which Dr. Tinsley did sign, as Trustee, under the terms of which Evans and Garrison paid a bonus of $2500 to Dr. Tinsley to reimburse him for all of the expenses that had been incurred in procuring those leases? While that may have fallen a few dollars short, didn't it practically cover the entire cost of procuring the leases? A. As stated above, the Davis property was purchased by Dr. J. R. Tinsley, Trustee, and the incorporators of the Interstate Oil and Gas Corporation spent $1500 in securing that property prior to the time that the contract between J. R. Tinsley, Trustee, and a firm by the name of Evans & Garrison was made.

"Q. What I am trying to get at is it not a fact that whatever the cost to the promotors was in procuring the leases, that that cost was paid back to them by Garrison and Evans before the corporation was formed, and that there was no stock at all paid in the corporation? A. Evans & Garrison paid to the promotors of the corporation $2500 for a half interest in the lease.

"Q. But wasn't that done before the corporation was organized? A. Before the corporation was organized and charter issued.

"Q. So that it is a fact that in the incorpora-

tion there wasn't anything paid on the subscription at all, the corporate stock was issued in consideration of the Tinsley lease, wasn't it? A. The promotors and incorporators of the Interstate Oil & Gas Corporation accepted in lieu of their interest in the Davis lease, stock in the incorporation.''

Dr. Tinsley had acted in the capacity of trustee for W. M. Pursifull on numerous occasions to enable Pursifull to conduct his business, that of a successful oil operator, without interference from his creditors. Although the corporation had a capital stock of only $15,-000, and no assets except the lease, it voted W. M. Pursifull at the first meeting of the incorporators a salary of $10,000 per annum in addition to his expenses, which expenses were never questioned, although included therein was the cost of educating his nephew. Pursifull had the power to draw checks when and as he pleased; and Dr. Tinsley not only admitted that the stock belonged to Pursifull, but testified that Cooper and Daniels had made similar admissions. No effort was made by any of the incorporators to set aside the assignment made to appellant by W. M. Pursifull until after the latter's death; and Dr. Tinsley testified that he recognized it as valid and did everything in his power to ratify it. Cooper and Daniels testified that they did not acquire knowledge of the assignment until the latter part of December, 1938. Either because of a desire to retain the property or because they feared to stultify their testimony given in the cases cited above, they attempted to make it appear that the corporation was formed and operated in good faith. But their testimony is not only thoroughly discredited by numerous contradictions, but by their execution of documents reciting that the stock held by them was at the disposal of Mrs. W. M. Pursifull. Their effort to explain these documents is puerile. It is not too much to say that their insistence that their ownership of the corporation was, in fact, bona fide, in the face of the testimony contained in this voluminous record and the inescapable deductions to be drawn therefrom, is a reflection on the intelligence of the court.

Thus, we are confronted with, what seems to us, the controlling question presented for decision by this appeal, namely, whether the appellee was precluded from maintaining this action by the maxim, ''He who comes into Equity must come with clean hands,'' which in its

applicaton to litgated consequences of fraudulent conveyances, is not regarded as an insurmountable bar to relief where the parties have not been in pari delicto. For example: Where the parties "have not, with the same knowledge, willingness, and wrongful intent, engaged in the transaction, or the undertakings of each are not equally blameworth," or where "imposition, oppression, duress, threats, undue influence, taking advantage of necessities or of weakness," have induced the action of one of the litigants. Pomeroy's Equity Jurisprudence, Volume 2, Section 942, quoted with approval in Breyfogle v. Bowman, 157 Ky. 62, 162 S. W. 787, 795. See also Sparkman et al., v. Triplett et al., 292 Ky. 569, 167 S. W. (2d) 323. But, where the parties are in pari delicto—and the parties to a fraudulent conveyance, nothing else appearing, are usually so regarded—the maxim guards and bars the portals of the court against both participants. We perceive no essential difference between the status occupied by appellee corporation and that of an individual grantee in a fraudulent deed. The corporate shell is not impenetrable to the eye of the court when it is shown that it was adopted as a shield against the light of truth. In such cases, the existence or absence of corporate formalities will be disregarded and the incorporators subjected to the rules of law governing individuals. Nor are we able to find any legal or rational basis for the contention raised by appellee's counsel that appellee's participation in the original transaction, assuming it to have been fraudulent, would not prevent it from obtaining relief against the consequences of W. M. Pursifull's allegedly fraudulent misconduct "in attempting to effect a re-conveyance to his assignee." If W. M. Pursifull was the actual owner of the property, he had at least the moral right to transfer it, and the authorities cited by appellee's counsel and listed below go only to the extent of holding that a grantor in a fraudulent conveyance who has been induced by deceit or imposition of the grantee to make the conveyance, or for other reasons has not been in pari delicto with him, may maintain an action to recover the property. But in such cases it was the true owner whom the court aided notwithstanding the maxim, not a fraudulent grantee who without moral right was trying to retain it. Carpenter v. Arnett et al., 265 Ky. 246, 96 S. W. (2d) 693; Stiefvater v. Stiefvater, 246 Ky. 646, 53 S. W. (2d) 926; Coffey v. Coffey, 232 Ky. 179, 22 S. W. (2d)

589; Sanford v. Reed, 85 S. W. 213, 27 Ky. Law Rep. 431; Menne's Heirs v. Menne, 25 S. W. 592, 15 Ky. Law Rep. 774.

After all, the maxim referred to is a creation of the courts to purify the stream of justice, and is never employed to pollute it. Regardless of the nature or extent of the consideration for the assignment to appellant, he is not shown to have been in pari delicto with his brother or the latter's grantee. Likewise unimportant are the means employed by W. M. Pursifull to effect the assignment, since he was the equitable owner of the property transferred, and the holder of the legal title had no moral right thereto. True, W. M. Pursifull could not have compelled the corporation to transfer the property to him, and under the generally prevailing rule of law, his assignee would have been equally powerless to do so. But we have been shown no rule of law or reason which would justify us in holding that the purported owners of the corporation who were in pari delicto with W. M. Pursifull, are entitled in the name of the corporation, or otherwise, to maintain an action against appellant who at least was not a participant in the fraudulent transaction which vested the corporation with its apparent ownership.

Judgment reversed with directions to dismiss the petition.

Whole Court sitting.